**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| MARY I. RITCHIE, | : | Case No. 3:16-cv-84 |
| | : | |
| Plaintiff, | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| NANCY A. BERRYHILL, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATIONS[1]**

## I.   Introduction

Plaintiff Mary I. Ritchie brings this case challenging the Social Security

Administration's denial of her application for Supplemental Security Income.  She

applied for benefits on July 2, 2013, asserting that she could no longer work a substantial

paid job due to a history of anxiety and depression, post-traumatic stress disorder,

obsessive-compulsive disorder, schizophrenia, anxiety, a learning disorder not otherwise

specified (NOS), anorexia nervosa, a personality disorder NOS, borderline personality

disorder, psychosis, bipolar disorder, minimal disc-space narrowing, and posterior facet

degenerative change at the L5-S1 level of the lumbosacral spine with a questionable pars

defect at the L5 level.  Administrative Law Judge (ALJ) Emily Ruth Statum concluded

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11), the administrative record (Doc. #6), and the record as a whole.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings.  The Commissioner asks the Court to affirm ALJ Statum's non-disability decision.

## II.    <u>Background</u>

Plaintiff asserts that she has been under a "disability" since July 5, 2008.  She was twenty-eight years old at the time and was therefore considered a "younger person" under Social Security Regulations.  She has a ninth-grade or limited education.

### A.    **Plaintiff's Testimony**

Plaintiff testified at the hearing before ALJ Statum that she is disabled because she has visual and auditory hallucinations.  (Doc. #6, *PageID* #115).  She takes medication to stop them, including Abilify, Cymbalta, and Klonopin.  *Id.* at 115-16.  She believes the medications help, but she still has visions of people and things when she lies down to go to sleep and has auditory hallucinations during the day.  *Id.* at 116.  Plaintiff sees a psychiatrist, Dr. Schmitt, approximately once per month.  *Id.* at 117.  She is supposed to see a therapist as well but she procrastinates making appointments.  *Id.* at 119.  Because her symptoms are not under control, Plaintiff's medication and doses continue to change.  *Id.* at 120.

Plaintiff also has obsessive-compulsive disorder (OCD).  *Id.*  Her symptoms include cutting her hair really short over and over again; taking three baths/showers per day to stay clean all the time; washing her hands all the time; and cleaning the house.  *Id.* at 121.  She is attempting to grow her hair out, but she thinks her OCD symptoms are under control because her husband hid the clippers and razors from her.  *Id.*

Plaintiff stated that in some ways her symptoms are getting better, and in some ways they are not.  *Id.*  She is more aware of herself and has better self-control.  *Id.*  But, she continues to hear things that are not true from other people.  *Id.*

Plaintiff indicated that she had an eating disorder at one point but it was not diagnosed.  *Id.* at 122.  She does not have it anymore.  *Id.*  She has a history of marijuana use and has also used alcohol and other drugs "pretty regularly."  *Id.* at 121.  She is no longer using drugs.  *Id.* at 122.  Plaintiff has been in the hospital several times.  *Id.* at 117.  She was last in a couple years ago, and she was there for eight days.  *Id.*

Plaintiff also suffers from back, knee, and foot pain.  *Id.* at 122.  She believes her foot is fractured.  *Id.*  She takes Ultram and ibuprofen for the pain but they make her feel tired.  *Id.* at 123.  At the time of the hearing, she stated that she scheduled an appointment to address her physical problems.  *Id.*

Plaintiff lives with her husband and two children.  *Id.* at 112.  Plaintiff has problems interacting with her husband.  *Id.* at 117.  She explained, "I think he's calling me names when he says he's not calling me name[s] and we argue."  *Id.* at 118.  She gets along well with her children.  *Id.*  Although it is sometimes overwhelming, she is able to "take care of things at home."  *Id.* at 123.  She prepares meals, helps her children with

homework, and cleans the house.  *Id.*  She also goes to the grocery, either walking there

with her children or going with her husband.  *Id.* at 118.  When she is at the grocery store,

she tries to "just get in and get out."  *Id.*

Plaintiff has never had a driver's license.  *Id.* at 112.  She has a ninth-grade

education, and she is able to read and write.  *Id.* at 113.  In school, she was in "LD

classes" for every subject.  *Id.* at 119.  She last worked at a hotel as a housekeeper in

2007 for "about a week or so."  *Id.* at 113.  Before that she worked at a gas station as a

cashier for a couple months.  *Id.*  In 2002, she worked at Russ' Market in the deli.  *Id.* at

114-15.  She worked at a Shell gas station and Wendy's in 2000.  *Id.* at 114.

### B.    Vocational Expert's Testimony

A vocational expert, Eric Pruitt, also testified at the hearing before ALJ Statum.

*Id.* at 124.  The ALJ asked Mr. Pruitt if the following hypothetical individual could

perform Plaintiff's past work:  Assume a younger individual, age 27-33, with a ninth-

grade education, Plaintiff's past work experience, and the ability to perform light work

except that the individual is able to perform unskilled work that is simple, carrying out

one to two-step tasks in a setting that does not require fast-pace or strict production

demands, with occasional contact with coworkers and supervisors and less than

occasional contact with the public.  *Id.* at 124-25.  Mr. Pruitt testified that the

hypothetical person could not perform Plaintiff's past work but could perform other work

in the national economy.  *Id.* at 125.  He gave the examples of laundry-press operator

(27,800 jobs nationally), buffing-machine tender (3,500 jobs nationally), and machine

cutter II (18,000 jobs nationally).  *Id.* at 126-27.  When asked how many unskilled, light

4

jobs there are in the national economy, Mr. Pruitt responded, "Nine million." *Id.* at 126. The ALJ asked, "Nine million?" and he responded, "324,378." *Id.* Mr. Pruitt further testified that the hypothetical individual could not perform jobs in the national economy if the individual only had the ability to stay on task occasionally or had the ability to respond appropriately to supervisors and coworkers on a less than occasional basis. *Id.*

### C. Medical Opinions

#### i. Mariella Toca, M.D.

Dr. Toca, Plaintiff's treating psychiatrist, completed an assessment on June 11, 2008. *Id.* at 934-36. She diagnosed major depressive disorder, single episode, moderate; sexual disorder, not otherwise specified (NOS); alcohol abuse; and cannabis abuse. *Id.* at 934. Dr. Toca opined Plaintiff was markedly limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods, and moderately limited in her ability to understand and remember detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine; work with or near others without being distracted by them; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers; respond appropriately to changes; and travel in unfamiliar place or use public transportation. *Id.* at 935.

Plaintiff reported to Dr. Toca that her mental health problems began in third grade. *Id.* at 936. When she was thirteen, she was removed from her mother's custody and placed with an aunt. *Id.* Between the ages of ten and fifteen, she was physically and sexually abused. *Id.* She reported using drugs and alcohol but said she stopped using

drugs when she was twenty-one years old and stopped drinking alcohol in 2006.  *Id.*  She

was used for sex when she was twenty years old and now has trust issues.  *Id.*  Dr. Toca

opined that she "experiences depressive mood with anxiety related to [her] past trauma."

*Id.*  Further, "She has difficulty following up with her [] appointments and staying on her

prescribed medication."  *Id.*  Dr. Toca concluded that Plaintiff is unemployable and her

limitations are expected to between nine and eleven months.  *Id.*

### ii.  Amita Oza, M.D.

Dr. Oza examined Plaintiff on September 10, 2013.  *Id.* at 411-16.  Dr. Oza noted

that Plaintiff was diagnosed with depression, social anxiety disorder, schizophrenia, and

OCD five years ago.  *Id.* at 411.  She also has hyperlipidemia, GERD, and pain in her

abdomen.  *Id.*  Upon examination, Dr. Oza noted that in her abdomen, she had

nonspecific left upper quadrant tenderness.  *Id.* at 412.  Dr. Oza opined that Plaintiff's

"main problems seem[] to be psychiatric."  She concluded, "provided psychiatrically she

can function and medically she can perform appropriate work-related activities.  *Id.*

### iii.  Kristen Haskins, Psy.D.

Dr. Haskins reviewed Plaintiff's records on August 30, 2013.  *Id.* at 155-64.  She

found that Plaintiff has three severe impairments:  an affective disorder, a personality

disorder, and an organic mental disorder.  *Id.* at 159.  She also has one non-severe

impairment, an alcohol, substance addiction disorder.  *Id.*  Under the "B' criteria of the

listings, Dr. Haskins opined Plaintiff has mild restriction of activities of daily living;

moderate difficulties in maintaining social functioning and maintaining concentration,

persistence, or pace; and no repeated episodes of decompensation.  *Id.* at 160.  Instead of

6

completing a new mental residual functional capacity assessment, Dr. Haskins adopted

"the ALJ determination dated 07/27/2011. It is adopted under AR 98-4." *Id.* at 162.

### iv. Cindy Matyi, Ph.D.

Dr. Matyi reviewed Plaintiff's records on November 15, 2013. *Id.* at 166-80. She

found that Plaintiff has three severe impairments: an affective disorder, a personality

disorder, and a learning disorder. *Id.* at 174. She also found that Plaintiff has five non-

severe impairments: a disease of the esophagus, migraines, a disorder of the thyroid

gland, a sleep-related breathing disorder, and an alcohol, substance addiction disorder.

*Id.* She agreed with Dr. Haskins that under the 'B' criteria, Plaintiff has moderate

difficulties in maintaining social functioning and maintaining concentration, persistence,

or pace. *Id.* However, Dr. Matyi found that she has moderate restriction of activities of

daily living and one or two repeated episodes of decompensation. *Id.*

Dr. Matyi opined that Plaintiff is markedly limited in her ability to interact

appropriately with the general public; and moderately limited in her ability to carry out

detailed instructions; maintain attention and concentration for extended periods; work in

coordination with or in proximity to others without being distracted by them; complete a

normal workday and workweek without interruptions from psychologically-based

symptoms and to perform at a consistent pace without an unreasonable number and

length of rest periods; accept instructions and respond appropriately to criticism from

supervisors; get along with coworkers without distracting them or exhibiting behavior

extremes; and respond appropriately to changes in the work setting. *Id.* at 176-77.

7

III.    **Standard of Review**

      The Social Security Administration provides Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 1382(a). The term "disability"— as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

      Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a

8

scintilla of evidence but less than a preponderance . . . ."  *Rogers*, 486 F.3d at 241

(citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal

criteria—may result in reversal even when the record contains substantial evidence

supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647,

651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial

evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting in part

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47

(6th Cir. 2004)).

## IV.    The ALJ's Decision

As noted previously, it fell to ALJ Statum to evaluate the evidence connected to

Plaintiff's application for benefits.  But, before reaching the present case, the ALJ

considered Plaintiff's previous application for benefits and the previous ALJ's decision.

ALJ Statum found, "The evidence shows that [Plaintiff's] condition has changed

appreciably since the issuance of the prior decision in July 2011.  The residual functional

capacity previously established in the decision of July 27, 2011, is no longer applicable.

The prior finding that [Plaintiff] has no 'past relevant work' continues to be applicable."

(Doc. #6, *PageID* #80-81).

9

After determining that she was not bound by the prior decision, ALJ Statum began her consideration of each of the five sequential steps set forth in the Social Security regulations.  *See* 20 C.F.R. § 416.920.  She reached the following main conclusions:

Step 1:   Plaintiff has not engaged in substantial gainful employment since July 2, 2013.

Step 2:   She has the severe impairments of a history of anxiety and depression, post-traumatic stress disorder, obsessive-compulsive disorder, schizophrenia, anxiety, learning disorder not otherwise specified (NOS), anorexia nervosa, personality disorder NOS, borderline personality disorder, psychosis, bipolar disorder, minimal disc-space narrowing, and posterior facet degenerative change at the L5-S1 level of the lumbosacral spine with a questionable pars defect at the L5 level.

Step 3:   She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:   Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work . . . subject to the following additional limitations:  unskilled and simple tasks with an ability to carry out one-step or two-step instructions in a work setting that does not require fast pace or strict production demands with occasional contact with co-workers and supervisors and less than occasional contact with the public."

Step 4:   She is unable to perform any of his past relevant work.

Step 5:   She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 80-97).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 97.

## V.    Discussion

Plaintiff contends that the ALJ's failure to follow the Regulations in evaluating the opinion evidence and in weighing her credibility, pain, and symptom severity denotes a lack of substantial evidence and error of law.  Additionally, she asserts that the ALJ failed to adequately account for her moderate limitation in concentration, persistence, or pace in the hypothetical to the vocational expert.  The Commissioner maintains that substantial evidence supports the ALJ's evaluation of medical opinions, credibility determination, and step-five findings.

### A.    Plaintiff's Credibility

ALJ Statum determined that Plaintiff's "allegations of disability" were "disproportionate and less than credible."  (Doc. #6, *PageID* #94).  The Sixth Circuit established a two-part analysis for assessing the credibility of a plaintiff's statements about his/her symptoms:

> First, the ALJ will ask whether there is an underlying medically determinable physical [or mental] impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a).  Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.  *Id.*

*Rogers,* 486 F.3d at 247; *see also* 20 C.F.R. § 416.929.  When evaluating the intensity, persistence, and limiting effects of a plaintiff's symptoms, the ALJ must consider the following factors: daily activities; location, duration, frequency, and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the plaintiff takes or has taken to alleviate symptoms;

11

treatment, other than medication, the plaintiff receives or has received for relief of symptoms; any measures the plaintiff uses or has used to relieve symptoms; and other factors concerning the plaintiff's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §416.929(c)(3).

The ALJ "must then make a finding on the credibility of the individual's statements about symptoms and their functional effects."  Soc. Sec. Rul. No. 96-7p, 1996 WL 374186, at *4 (Soc. Sec. Admin. July 2, 1996).[2]  "Social Security Ruling 96-7p also requires the ALJ explain his credibility determinations in his decision such that it must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Rogers*, 486 F.3d at 248 (internal quotation and footnote omitted); *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so.") (citation omitted).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y of Health & Human Servs.,* 818 F.2d 461, 463 (6th Cir. 1987); *see Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 542 (6th

---

[2] The Social Security Administration issued Soc. Sec. Rul. No. 16-3p, effective March 16, 2016, which supersedes Soc. Sec. Rul. No. 96-7p.  At the time of the ALJ's decision in this case, Soc. Sec. Rul. No. 96-7p was still in effect.

Cir. 2007).  However, an ALJ's assessment of credibility must be supported by substantial evidence.  *Cruse,* 502 F.3d at 542 (citing *Walters,* 127 F.3d at 531).

In the present case, the ALJ found, "The extent of (physical and mental) impairment alleged by [Plaintiff] is unsubstantiated by convincing objective medical evidence or clinical findings.  [Plaintiff's] allegations appear somewhat excessive when viewed within the context of the medical record."  (Doc. #6, *PageID* #93).  The ALJ emphasizes a few of Plaintiff's activities:  maintaining the residence for her husband and children; walking to the grocery; running errands; and preparing meals.  *Id.*

Although Plaintiff may do those activities some of the time, there is no evidence that she is able to do them "on *a sustained basis,* which is how the functional limitations of mental impairments are to be assessed."  *Gayheart,* 710 F.3d at 377 (citing 20 C.F.R. § 404.1520a(c)(2); 20 C.F.R. Part 404, Subpart P, Appendix 1, at 12.00)).  For example, Plaintiff reported in August 2013 that she gets overwhelmed at home and isolates herself from her children and husband.  (Doc. #6, *PageID* #858).  Additionally, in May 2013, a physician noted that she "seems to be having difficulty fulfilling responsibilities at home."  *Id.* at 402.  When Plaintiff told a social worker that her eight-year-old son sees a psychiatrist because he has anger issues and is noncompliant, the social worker noted, "Client presented with no awareness of how her *inconsistent presence* in [the] home[,] drug use[,] and other behaviors may be connected to her child's issues."  *Id.* at 402, 853 (emphasis added).

The record reveals that Plaintiff was absent from home, sometimes for long periods of time, and notes from Eastway Behavioral Healthcare (Eastway) indicate

Plaintiff's husband has full custody of the children and he owns the house.  *Id.* at 853.

On September 13, 2012, for example, she told hospital staff that she was leaving her

husband and going to stay at a homeless shelter.  *Id.* at 563.  More than one month later,

on October 19, 2012, she returned to the hospital for a psychiatric evaluation, agreed to

let the social worker contact her husband, and then returned home.  *Id.* at 607-09.  In

November 2012, Plaintiff reported to the emergency department that she and her husband

got into a fight and "he threw [her] out . . . ."  *Id.* at 1174.  Thus, Plaintiff's ability to

intermittently maintain the household, walk to the grocery, run errands, and prepare

meals is not inconsistent with her asserted limitations.

      The ALJ further found that "observable clinical signs . . . reveal that [Plaintiff's]

condition has improved with sobriety."  *Id.* at 93.  She notes, "an examination on January

14, 2014 revealed that she was alert and oriented as to the time, person and place and

exhibited normal psychomotor activity . . . ."  *Id.* at 93 (citing Ex. B44F at 5).  Further,

"an examination on May 29, 2012 disclosed a normal mood, normal judgment and a

normal affect despite claims of *increasing anxiety and suicidal ideation.*"  *Id.* at 93

(emphasis added) (citing Ex. B28F at 4).  It is difficult to understand how this note shows

improvement of Plaintiff's conditions, as it seems unlikely that Plaintiff's mood,

judgment, or affect were "normal" when she was "thinking about, considering, or

planning suicide."  *Definitions:  Self-Directed Violence*, CENTERS FOR DISEASE CONTROL

& PREVENTION, https://www.cdc.gov/violenceprevention/suicide/definitions.html (last

updated Aug. 15, 2016).

The ALJ's examples are the very definition of cherry-picking the record.  "Instead of performing a proper analysis of the medical evidence under agency regulations and controlling case law, the ALJ cherry-picked select portions of the medical record to discredit [the plaintiff's] complaints . . . ."  *Minor v. Comm'r of Soc. Sec.,* 513 F. App'x 417, 435 (6th Cir. 2013) (citing *Germany–Johnson,* 313 F. App'x. 771, 777 (6th Cir. 2008) (noting the ALJ "was selective in parsing the various medical reports"); *Boulis– Gasche v. Comm'r of Soc. Sec.,* 451 F. Appx. 488, 494 (6th Cir. 2011) (noting ALJ's conclusion was "grounded in a myopic reading of the record combined with a flawed view of mental illness")).  The ALJ compounded this problem by relying on these specific facts over and over again.  The ALJ mentions five separate times throughout her decision that Plaintiff was cooperative, had no impairment of cognition, average intelligence, a full affect, good demeanor and a euthymic mood on August 22, 2013.  *Id.* at 87, 89, 93-95 (all citing Ex. B4F at 7-8).  Similarly, she notes five times that on January 14, 2014, Plaintiff was alert and oriented to the time, person, and place; and exhibited normal psychomotor activity, normal mood and affect, normal speech, normal digit recall and number repeating, normal concentration, normal/average intelligence, and intact memory, judgment, and insight.  *Id.* at 88, 89, 93-95 (all citing Ex. B44F at 5-6).

The ALJ's examples are not representative of the record as a whole.  For example, when documenting Plaintiff's *objective mental status*, physicians at Eastway regularly opined that Plaintiff's mood was depressed (ten of fourteen appointments) and her affect was constricted (nine of fourteen).  *Id.* at 388-402, 858-63, 1256, 1359-64.  Eastway's

progress notes distinguish between subjective reports by the patient and clinical observations by physicians.  Plaintiff's mood and affect fall under clinical observations.

Additionally, the ALJ omits or ignores that Plaintiff presented to Grandview Hospital and Miami Valley Hospital reporting symptoms of her mental impairments (this includes the times Plaintiff had both mental and physical symptoms) at least eighteen times between 2009 and 2013.  *Id.* at 429-519, 563-628, 708-69, 954-1010, 1028-37, 1058-1066, 1077-87, 1112-24, 1139-43, 1168-97.  In addition to those visits, Plaintiff reported to the hospitals eighteen times with only physical symptoms between 2010 and 2014.  *Id.* at 526-53, 642-97, 778-838, 1011-27, 1043-51, 1077-87, 1129-43, 1147-66, 1199-1206, 1214-31, 1241-1352.  Substantial evidence does not support the ALJ's finding that Plaintiff's condition has improved.

The ALJ also notes that "the record refers to non-compliance with treatment or medication."  *Id.* at 93.  "The administrative law judge's reference to [the plaintiff's] failing to take his medication ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medication."  *Spiva v. Astrue,* 628 F.3d 346, 351 (7th Cir. 2010).  The record reveals that Plaintiff struggled to find effective medications without negative side effects.  In March 2012, Plaintiff reported that citalopram was ineffective for her depression and she thought it made things worse. (Doc. #6, *PageID* #388).  She also felt that hydroxyzine was not effective in easing her anxiety.  *Id.*  She indicated in August 2012 that Risperdal was causing dry mouth and fatigue, and its efficacy/benefit in alieving her psychological problems was decreasing.  *Id.* at 392.  In January 2014, Plaintiff requested a new antidepressant because Zoloft was

16

causing emotional blunting. *Id.* at 1364. In April 2014, she reported Vistaril caused "worsening agitation." *Id.* at 1359. She told a physician in May 2014 that she thought Latuda was working against her. *Id.* at 1356. "[F]ederal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of the mental impairment itself and, therefore, neither willful nor without justifiable excuse.'" *Pate-Fires v. Astrue,* 564 F.3d 935. 945 (8th Cir. 2009) (quoting in part *Mendez v. Chater,* 943 F.Supp. 503, 508 (E.D. Pa. 1996) (other citations omitted). There is no indication that ALJ Statum considered that Plaintiff's noncompliance with treatment was a symptom of her mental impairments.

The ALJ found, "The record does not reveal credible evidence of limitations stemming from the alleged OCD." (Doc. #6, *PageID* #94). It is unclear why the ALJ would refer to Plaintiff's OCD as "alleged" when she already found it to be a severe impairment. Nevertheless, the record illustrates several significant signs and symptoms of her OCD. Plaintiff reported that she cut off her hair because she wanted to look more like her siblings. *Id.* at 854. She then continued to cut it over and over again because it "feels like an obsession." *Id.* at 860. She testified that she thought she was improving but then indicated that she was simply unable to cut her hair because her husband hid the scissors and razor. *Id.* at 121. She also washed her hands so many times that she had to go to the hospital for hand irritation, cracking, and swelling. *Id.* at 708. During her diagnostic assessment update at Eastway, she reported washing her hair so much that she went through a bottle of shampoo in one to two days. *Id.* at 380. And, in August 2013, a physician's assistant at Eastway noted, "Patient seems to be overly focused on self

17

behaviors such as swallowing her phlegm and then refers to herself as gross." *Id.* at 858. These activities are not consistent with an ability to work.

The ALJ also determined that Plaintiff's "assertions that she has visual and auditory hallucinations are inconsistent with the examinations of record that disclose no impairment of cognition, average intelligence, a full affect, good demeanor and a euthymic mood . . . ." *Id.* at 94 (citations omitted). The record, however, reveals that although Plaintiff had good days, she consistently reported hallucinations. For example, in November 2012, Plaintiff presented to the emergency department with complaints of suicidal ideation and hallucinations. *Id.* at 1174. She explained that she has been seeing flies and hearing her own voice constantly. *Id.* The physician noted, "Patient makes frequent trips to the ED but crisis worker felt she is worse than usual this time and a potential risk to self." *Id.* In February 2013, Plaintiff struggled with hallucinations. *Id.* at 398. She explained, "the disorder messes my life. I cannot think straight. I am not ahead of time. My mind is not in reality. . . . I am not eating, I am angry. I am not myself and that voice is always in my head. I am not happy with the illness, the disorder or whatever." *Id.* And, "[w]hile her medication might help her control her condition, it does not alleviate the possibility she will relapse." *Pates-Fires,* 564 F.3d at 947.

The ALJ considered Plaintiff's limited work history, noting she had minimal earnings in 1999-2003, 2005, and 2007, and no earning in 2004 and 2006. (Doc. #6, *PageID* #94). The ALJ concluded, "the minimal and sporadic work history revealed by her earning record raises a question as to whether [Plaintiff's] continuing unemployment

18

is actually due to medical impairments." *Id.* at 94.  In reaching this conclusion, however, the ALJ overlooks or ignores several key facts.

The record reveals that Plaintiff's mental health problems did not begin suddenly in 2008, when she alleges her disability began.  Dr. Toca noted that when Plaintiff was thirteen years old, she was removed from her mother's custody and placed with an aunt. *Id.* at 936.  "[Plaintiff] said mood swings began around this time and worsened to include depression [and] using drugs and alcohol . . . ."  *Id*.  Plaintiff also reported physical and sexual abuse between the ages of ten and fifteen and being used for sex at age twenty.  *Id*.

In August 2006, Plaintiff presented to Eastway for an assessment after "taking her anger out" on her three-year-old daughter."  *Id.* at 353.  They noted that she attempted suicide in 2001.  *Id*.  Further, she reported hearing her own voice in her head making negative comments; daily panic attacks; anxiety; trouble concentrating; and crying episodes.  *Id.* at 357.  In November 2006, a psychiatrist evaluated her and diagnosed major depressive disorder, single episode, chronic moderate; obsessive-compulsive disorder; generalized anxiety disorder; post-traumatic stress disorder; panic disorder without agoraphobia; sexual disorder, not otherwise specified; borderline personality disorder; alcohol abuse; and cannabis abuse, early full remission.  *Id.* at 386.  There is no indication that the ALJ considered this evidence before speculating that Plaintiff's unemployment was not due to her medical impairments.

Substantial evidence not support the ALJ's assessment of Plaintiff's credibility. Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[3]

### B.    Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746.  Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994).  The latter is warranted where the evidence of disability is overwhelming or

---

[3] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's challenge to the ALJ's assessment of the medical opinions and her hypothetical question posed to the vocational expert is unwarranted.

where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of §405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her application for Supplemental Security Income should be granted.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Mary I. Ritchie was under a "disability" within the meaning of the Social Security Act;

3. This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4. The case be terminated on the Court's docket.


Date:  February 13, 2017                        *s/Sharon L. Ovington*
                                                Sharon L. Ovington
                                                United States Magistrate Judge

21

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).